**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

Your Affiant, Anthony J. Sansone, Special Agent of Homeland Security Investigations (HSI), being duly sworn, deposes and says:

1. Your Affiant is an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. Your Affiant is a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). Your Affiant has been a Special Agent since June of 2019. Your Affiant is assigned to the Assistant Special Agent in Charge (ASAC) Nogales, Arizona office.

3. As a Special Agent with HSI, your Affiant is responsible for investigating and enforcing violations of federal law to include the enforcement of controlled substances, immigration, money laundering, and various customs violations.

4. Your Affiant graduated from the Criminal Investigator Training Program and the HSI Special Agent Training Course located at the Federal Law Enforcement Training Center in Glynn County, Georgia. At this institution, your Affiant received specialized training including investigations of illegal drug, immigration, fraud, cybercrime, import/export, and child pornography offenses; firearms, defensive tactics, surveillance, and undercover operations. Your Affiant also holds a bachelor's degree in Organizational Leadership from Chapman/Brandman University.

5. In addition to your Affiant's experience as a Special Agent with HSI, your Affiant worked as an Environmental Health and Safety Coordinator with International Paper's (IP) Yakima facility. While in this capacity your Affiant investigated safety procedures and reported environmental standings and metrics to various monitoring organizations. Prior to employment with IP, your Affiant served for over twenty years in the U.S. Army, the bulk of which was served within the special operations community.

6. As a Special Agent with HSI, your Affiant is responsible for investigating and enforcing violations of federal law, including those enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code.

7. As part of your Affiant's current duties with HSI in Nogales, Arizona, your Affiant has participated in criminal investigations involving firearm trafficking organizations (FTOs). Pursuant to participation in these investigations, your Affiant has performed various tasks including: (a) functioning as a case agent, which entails the supervision of specific investigations involving the trafficking of narcotics, munitions and weapons; (b) functioning as a surveillance agent and thereby observing and recording movements of persons smuggling narcotics, weapons, illicit proceeds, and other activity in support of their illegal activities; (c) interviewing witnesses, suspects, cooperating individuals, and confidential sources relative to the illegal smuggling of narcotics, weapons, and illicit proceeds; and (d) participating in investigations involving narcotics and weapons trafficking.

8. While conducting narcotics and weapons trafficking investigations, your Affiant has personally interviewed persons involved in the distribution of illegal narcotics, and weapons trafficking into Mexico. Your Affiant has consulted with Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) investigators concerning the practices of weapons traffickers and the best methods of investigating them. In preparing this affidavit, your Affiant has conferred with other Special Agents and law enforcement officers involved in this investigation. Furthermore, your Affiant has personal knowledge of the following facts or has learned them from the individuals mentioned herein.

9. Pursuant to 18 U.S.C. § 3051, your Affiant is empowered to enforce criminal laws of the United States. As a result of your Affiant's training and experience, your Affiant is familiar with federal laws, including 18 U.S.C. § 554(a), which states that whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than ten years, or both.

10. Your Affiant is also familiar with 18 U.S.C. § 371, which states that if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

11. Based upon your Affiant's experience in conducting criminal investigations of violations of federal firearms and ammunition laws, your Affiant knows that firearm and ammunition trafficking organizations have developed several methods to insulate their illegal activities from law enforcement detection. These methods are common to firearm and ammunition trafficking organizations to varying degrees of sophistication. One method that trafficking organizations have employed is to purchase firearms from the "secondary market" (through a private seller rather than a Federal Firearms Licensee). Firearm and ammunition trafficking organizations often purchase firearms from the secondary market because an individual does not need to provide identification or undergo a background check in order to obtain a firearm from a private seller, as the individual is required to do when her or she purchases a firearm from a Federal Firearms Licensee.

12. Your Affiant knows that an individual must complete an ATF Form 4473, Firearms Transaction Record, in order to purchase a firearm from a Federal Firearms Licensee (FFL). To acquire a firearm, the purchaser must answer a question which asks: "Are you the actual transferee/buyer of the firearm(s) listed on this form? *Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.*" The purchaser must also acknowledge, by signature, that if he or she answers "Yes" to the question but is not the actual transferee/buyer, he or she has committed a felony under Federal law.

13. Your Affiant knows that firearm and ammunition trafficking organizations from Mexico utilize "straw purchasers" from the United States to illegally purchase firearms and

ammunition. A straw purchaser is someone who knowingly acquires firearms and/or ammunition for someone who is prohibited by law from acquiring them or does not want his or her name associated with the acquisition of the firearms and/or ammunition. Firearm and ammunition trafficking organizations typically employ and finance several straw purchasers to purchase firearms, ammunition and/or firearm accessories (such as magazines, gun cleaning supplies, etc.) from different Federal Firearms Licensees (FFLs) – which are commonly referred to as "gun stores" or "gun shops" – retail stores, online retail websites, and internet-based sales, barter or auction websites such as Gunbroker.com and GunsAmerica.com, and firearm groups on Facebook.com.  Straw purchasers commonly frequent gun shows, purchase large amounts of firearms and ammunition, and purchase firearms and ammunition from numerous FFLs, retailers, online distributors, and internet websites or groups.  A vast number of firearms trafficking organizations from Mexico purchase similar firearms, and ammunition for said firearms, which are referred to by ATF as "weapons of choice."  These firearms include semi-automatic and automatic military type rifles such as AK 47-type rifles and pistols (7.62x39mm caliber); AR 15-type rifles and pistols (5.56/.223 caliber); 9mm caliber, .40 caliber, .38 Super caliber, and .45 caliber pistols; and Barrett .50 BMG rifles.  Moreover, I know that in recent years, Mexican firearms trafficking organizations have commonly been acquiring a specific AK-47 variant pistol – a Pioneer Arms Corporation model Hellpup 7.62 caliber pistol.

14. Your Affiant knows that illegal firearm and ammunition traffickers often utilize cellular telephones to communicate with other co-conspirators, FFLs, and individuals selling firearms on the secondary market.  These cellular telephones are often held in the name of other living or fictitious persons.  Further, firearm and ammunition traffickers change phone numbers and mobile devices frequently to limit law enforcement officials' ability to identify and track suspects' call histories.  These individuals often have multiple devices in their possession at one time.

15. Your Affiant knows that individuals involved in dealing firearms without a license often post their firearms for sale on websites such as Armslist.com and Backpagegun.com, or on social media applications ("apps") such as Instagram or Snapchat.  These individuals often utilize their cellular telephones to post their firearms for sale, communicate with potential buyers, and make meeting arrangements with buyers.  Additionally, these individuals also utilize laptops, tablets, and other internet capable devices to access such accounts to conduct illicit business.

16. Your Affiant knows that firearms sold by individuals involved in dealing firearms without a license are often recovered by law enforcement agencies in connection with criminal activity. This happens, in large part, because people who acquire firearms for nefarious purposes often obtain the firearms from the secondary market, where background checks are not required.

17. Your Affiant knows that firearm and ammunition traffickers often utilize computers and electronic storage devices to research the price and availability of firearms and ammunition, and to acquire, pay for, and keep records of firearms and ammunition purchases.  Firearm and ammunition trafficking organizations also utilize code words for quantities and types of firearms and ammunition that are being purchased, sold, and/or transferred in effort to avoid detection by law enforcement officials.

18. Your Affiant submits this Affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a Search Warrant authorizing the examination of the contents of an electronic communication device capable of accessing the internet (the "Target Device") identified below and in Attachment A hereto, and the extraction from the Target Device of electronically stored information further described in Attachment B hereto.  Because this Affidavit is being submitted for the limited purpose of securing a warrant to search the Target Device, your Affiant has set forth only the facts which your Affiant believes are necessary to establish probable cause to search the Target Device.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

19. The property to be searched is as follows:

    a. A black Samsung cell phone, IMEI 355069173572187 (Target Device), which HSI Agents seized from the DeConcini POE on November 11, 2021. The Target Device was determined to belong to Ismael Gilberto FIGUEROA and is currently in the custody of the HSI Nogales agents at the Nogales ASAC office and powered on with the SIM card out for preservation of evidence.

20. The warrant requested authorizes the forensic examination of the Target Device for the purpose of identifying the electronically stored information described in Attachment B.

### BACKGROUND ON SMARTPHONES

21. Based upon your Affiant's knowledge, training, and experience, as well as information related to me your Affiant by law enforcement officers and others experienced in the forensic examination of electronic communication devices, your Affiant knows that certain types of cellular telephones referred to as "smartphones" (such as the Target Devices) generally offer more advanced computing ability and internet connectivity than standard cellular telephones. Provided that internet access has been purchased through an electronic communication service provider for a particular smartphone, a smartphone is capable of running complete operating system software, has full access to the internet and/or electronic mail (including file attachments), is capable of text and instant messaging, can create and edit documents created with computer software, is capable of storing large amounts of data, and can be interfaced with desktop and laptop computers.

22. As described in Attachment B hereto, this Affidavit seeks permission to locate not only data files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes what individual(s) used the Target Device as well as the purpose of their use.  Additionally, this Affidavit seeks information about the possible location of other evidence.

23. As described in Attachment B hereto, this Affidavit also seeks permission to search and seize certain electronic records that might be stored within the Target Device.  Some of these electronic records might take the form of files, documents, or other data that are user-

generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

24. Although some of the records requested in this Affidavit might be found in the form of user-generated documents (such as electronic format documents and picture and movie files), electronic communication devices (such as the Target Device) can contain other forms of electronic evidence that are not user-generated. In particular, an electronic communication device may contain records of how it has been used and/or the person(s) who utilized the electronic communication device. Based upon your Affiant's knowledge, training, and experience, as well as information related to your Affiant by law enforcement officers, and other persons involved in the forensic examination of electronic communication devices, your Affiant knows that:
    a. Data on electronic communication devices not currently associated with any file can provide evidence of a file that was once on the electronic communication device, but has since been deleted or edited, or of a deleted portion of a file;
    b. Virtual memory paging systems can leave traces of information on an electronic communication device that can be used to determine what tasks and processes were recently in use;
    c. Web browsers, e-mail programs, social media platforms, and chat programs store configuration information on the electronic communication devices that can reveal information such as online nicknames and passwords;
    d. Operating systems can record additional information, such as the attachment of peripheral electronic devices, and the number of occasions on which the peripheral electronic devices were accessed;
    e. Computer file systems can record information about the dates that files were created and the sequence in which they were created. This information may be evidence of a crime and/or indicate the existence and/or location of evidence in other locations on the electronic communication device;
    f. When an electronic communication device has more than one user, files can contain information indicating the dates and times that the files were created as well as the sequence in which the files were created, and whether a particular user accessed other information close in time to the file creation dates, times, and sequences;
    g. The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying an electronic communication device user, and contextual evidence excluding an electronic communication device user. All these types of evidence may indicate ownership, knowledge, and intent to commit a given offense; and
    h. The foregoing type of evidence is not "data" that can be segregated, that is, this type of information cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators. Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how electronic communication devices operate and how electronic communication devices are used. Therefore, contextual information necessary to understand the evidence described in Attachment B hereto also falls within the scope of the warrant.

## HISTORY OF INVESTIGATION AND PROBABLE CAUSE

25. On November 10, 2021, at approximately 10:45 a.m., Ismael Gilberto FIGUEROA, the driver, and registered owner of a blue 2015 Dodge Journey bearing Arizona temporary plate 52495HP, along with his girlfriend, Katelyn Ashley Craig, were stopped and referred for a secondary inspection based on officer awareness during outbound operations into the Republic of Mexico from the United States at the DeConcini Port of Entry in Nogales, Arizona.

26. The primary Customs and Border Protection Officer (CBPO) assigned to outbound Counter Enforcement Team (CET) operations observed suspicious behavior, such as FIGUEROA smoking with the windows rolled up, during slow moving traffic. The secondary CBPO, also assigned to (CET) operations, observed nervous behavior such as Craig's shaky hands while handing over the vehicle registration, as well as Craig rocking back and forth in her seat. FIGUEROA was observed with shaky hands while smoking, and he repeatedly looked back towards the rear cargo area of the vehicle.

27. The CBPOs received negative binding declarations from FIGUEROA and Craig for weapons, ammunition, or currency in excess of $10,000 in their possession. FIGUEROA and Craig were escorted to a waiting area while their vehicle was driven through the Z-Portal (x-ray) machine.

28. The Z-Portal inspection resulted in negative findings for anomalies. However, during the seven-point inspection of the vehicle, CBPOs noticed that the third-row seat was in the down position. Upon raising the seat into the upward position, CBPOs found a blue bag, which contained .50 caliber rifle parts, specifically: one Barrett M107 A1 firearm lower receiver, one Barrett M107 A1 bolt carrier group, and one Barret M107 A1 ammunition magazine

29. Both FIGUEROA and Craig were taken into custody.

30. FIGUEROA was separated from his cellular telephone during the inspection, and CBPOs heard sounds coming from the phone. CBPOs noticed messages coming across the screen of the phone from a Mexican phone number, with phrases similar to: "Where's my stuff?" "Where are you?" and "You need to answer when I call you."

31. Based on your Affiant's training and experience, your Affiant believes that the coordinator of the smuggling attempt was contacting FIGUEROA on his cellular telephone and was inquiring about the location of the weapon components were as well as FIGUEROA himself. The coordinator is believed to be a person who might be in command and control of FIGUEROA's smuggling activity, by telling FIGUEROA that he needs to answer his phone when the coordinator contacts him. This type of hierarchy is typical of contraband smuggling organizations, with the persons who transports the contraband to be considered at the bottom of the power structure

32. Your affiant interviewed Craig, who claimed to have no knowledge about the weapons parts which were concealed within the vehicle's rear cargo area, Craig said she suspected that the weapons components were most likely to be sold to FIGUEROA's cousin Juan Acosta, as FIGUEROA was speaking with Acosta earlier that day.

33. Your affiant also interviewed FIGUEROA. During the interview, FIGUEROA's cellular telephone, which was sitting on the table throughout the interview, began to ring. The display on the phone indicated the name of "Santiago," who FIGUROA claimed was his brother. When asked why SANTIAGO would be calling at such an odd hour, FIGUEROA said that his brother was just keeping in touch because they are very close. In your Affiant's knowledge and experience, during interviews of suspects, especially at the Port of Entry, it is common for a suspect's cellular telephone to receive incoming calls and text messages from other co-conspirators, suspects, and other concerned parties.

34. Often, persons tasked with the job of transporting illegal contraband into, out of, and within the United States communicate with the persons overseeing the transportation by wireless telephone before and during the time the load is in transit. The drivers of the load vehicles often communicate with the FTO and Drug Trafficking Organization (DTO) coordinators and/or other co-conspirators for guidance and further direction. At times, the load drivers are not informed of the delivery location until they have successfully entered the United States or Mexico. Based on training and experience, your Affiant knows that if the load driver was to know in advance the final destination of the illegal contraband, and the load was to be seized by law enforcement at a checkpoint, Port of Entry, or otherwise, the driver would be in a position to direct law enforcement to the final destination if he/she cooperated. This could lead to the arrest of other co-conspirators, who therefore withhold this information from drivers of load vehicles until the vehicles have successfully crossed through checkpoints and/or Ports of Entry undetected.

## CONCLUSION

35. Based upon the above, your Affiant believes that probable cause exists to search the Target Device for the items set forth in Attachment B hereto. Your Affiant believes that the Target Device contains evidence relating to the commission of criminal offenses, specifically: smuggling of goods from the United States, as well as conspiracy to do so, in violation of Title 18, United States Code, Sections 554(a) and 371.

36. Based on the foregoing, your Affiant requests that the Court issue the proposed search warrant pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. Considering the ongoing investigation referred to in this Affidavit, and the need to avoid any one of the adverse results enumerated in 18 U.S.C. § 2705(a)(2), it is further requested that this Affidavit be filed under seal and that notice of the order be delayed for a period of 180 days.

37. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to

destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted this   24th   day of November 2021.

ANTHONY J SANSONE
Digitally signed by ANTHONY J SANSONE
Date: 2021.11.24 12:42:10 -07'00'

Anthony J. Sansone
Special Agent, HSI

Sworn and subscribed to me telephonically this  29th  day of November 2021.

Honorable Bruce G. Macdonald
United States Magistrate Judge

# ATTACHMENT A

## ITEM TO BE SEARCHED

The property to be searched is:

The Target Device: one black Samsung cellular telephone, bearing International Mobile Equipment Identity ("IMEI") 355069173572187, currently in the custody of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI).

<u>**ATTACHMENT B**</u>

**PARTICULAR THINGS TO BE SEIZED**

1. All records on the Target Device, as described in Attachment A, that relate to violations of 18 U.S.C. §§ 554(a) and 371, including:
    a. types and amounts of weapons and/or ammunition purchases, as well as the location of the purchase and/or identity of the person(s) who made the purchase;
    b. any information related to sources of ammunition, weapons, or money (including names, addresses, phone numbers, or any other identifying information) or the destination or individuals to whom the ammunition, weapons, or money were to be delivered (including names, addresses, phone numbers, or any other identifying information);
    c. any information recording FIGUEROA's schedule, travel, or location from November 1, 2021, to present;
    d. GPS location data, including coordinates, stored on, or accessed through the Target Device;
    e. data indicating locations on maps stored on or accessed through the Target Device;
    f. any information recording contact between FIGUEROA and any co-conspirators;
    g. electronic correspondence stored on and/or accessed through the Target Device relating to weapons smuggling, including emails and attached files, text messages, and instant messaging logs.

2. Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on and/or accessed through the Target Device.

3. Contact lists stored on and/or accessed through the Target Device, including telephone and email contact names, telephone numbers, physical addresses, email addresses, and internet access information.

4. Any images, photographs, or videos depicting evidence of contraband smuggling contrary to law, specifically weapons and narcotics trafficking, as these two crimes have a relevant nexus with one another, especially as it pertains to the Ports of Entry between the Republic of Mexico and the United States.

5. Evidence of persons who used, owned, and/or controlled the Target Device, including logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, instant messaging logs, photographs, electronic correspondence, and contacts stored on and/or accessed through the Target Device.

6. Any evidence or records that may be recovered or restored and that was previously deleted from the Target Device depicting evidence of contraband smuggling contrary to law, specifically weapons and narcotics trafficking.

7. Records evidencing the use of the Target Device to access the Internet depicting evidence of contraband smuggling contrary to law, including:
   a. records of Internet Protocol (IP) addresses used;
   b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms entered by the user into Internet search engines, and records of user-typed web addresses.

8. Any data/information stored on the Target Device's subscriber identity module (SIM) card(s), or all other cards used in the storing of information in the Target Device, including any images, photographs, videos, telephone numbers, pager numbers, names and addresses, electronically stored text messages, calling card numbers, email, Internet access information, contacts, and/or identifying information depicting evidence of contraband smuggling contrary to law.

9. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

10. In some cases, the Target Device may be damaged beyond repair, password protected, or otherwise inoperable, and less invasive data analysis techniques will not accomplish the forensic goals of the examination. In these cases, an analysis technique referred to as "chip-off" may be implemented to conduct the data extraction process. Chip-off is an advanced digital data extraction and analysis technique which involves physically removing flash memory chips from a subject device and then acquiring the raw data using specialized equipment. This process renders the wireless communication device unusable.